UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

EASTERN DIVISION

| | |
|---|---|
| In the Matter of the Application of the United States of America for a Seizure Warrant for All Cryptocurrency Found in Jesse WASSON's iCloud, as Further Described in Attachments A and B | 2:25-mj-557 Case No. <br><br> **Filed Under Seal** |

**AFFIDAVIT IN SUPPORT OF
APPLICATION FOR SEIZURE WARRANT**

I, William Jake VonEssen, being first duly sworn, hereby state as follows:

**Introduction and Agent Background**

1.      I am a Special Agent with the Drug Enforcement Administration (DEA) and have been since January of 2022.  As such, I am an "investigative or law enforcement officer" of the United States within the meaning of 18 U.S.C. § 2510(7), that is, an officer of the United States empowered by law to conduct criminal investigations and make arrests for offenses enumerated in 18 U.S.C. § 2516.  I am empowered to investigate, to make arrests with or without warrants and to execute search warrants under the authority of 21 U.S.C. § 878.  I hold a Bachelor's Degree in Aerospace from Middle Tennessee State University.  I have undergone the following training:

a.  I have completed the DEA Basic Agent Training Academy, which is a 17-week course in Quantico, Virginia, that includes (but is not limited to) training in the following areas: surveillance, undercover operations, report writing, confidential source management, drug identification, legal principles, search warrant operations, case initiation and development, interview and interrogation, defensive tactics, physical training, and firearms proficiency.  I continue to receive training on a daily basis by conducting criminal drug investigations and drawing from the expertise of agents more experienced than

1

myself.

      b.  Additionally, as a DEA Special Agent, my experience includes participating in criminal arrests; conducting physical surveillance; trash seizures; searching for evidence during court-authorized search warrants; authoring search warrants, court orders, and subpoenas; conducting interviews; and conducting open-source research as well as research from law enforcement databases.

      c.  I have participated in several trainings on topics such as financial/money laundering investigation, asset forfeiture, online/cyber investigation, technical operations (covert surveillance deployment and monitoring, undercover audio/video "bugs," and basic networking), mobile device forensic extraction and analysis examination, and cryptocurrency exploitation.

      d.  I am currently assigned to the Columbus Cyber Narcotics Joint Task Force (CNJTF) in Columbus, Ohio (which consists of investigators with the Drug Enforcement Administration (DEA), Immigration and Customs Enforcement – Homeland Security Investigations (HSI), United States Postal Inspection Service (USPIS), Internal Revenue Service – Criminal Investigation (IRS-CI), Franklin County Sheriff's Office (FCSO), and Upper Arlington Police Department (UAPD)).

2.    The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other law enforcement officers and/or law enforcement sources at the time of writing. This affidavit is intended to show merely that there is sufficient probable cause for the requested seizure warrant and does not set forth all my knowledge about this matter.

**PURPOSE OF AFFIDAVIT**

3.      This affidavit is submitted in support of an application for a combined criminal and civil forfeiture seizure warrant for all funds – including cryptocurrencies – stored in or accessible via the wallets below that are identified by their first two recovery seed phrase words (the exact cryptocurrency coin is listed next to each wallet in parenthesis):

      a.   boss theory (Bitcoin)

      b.   census weapon (Monero)

      c.   clever defense (Ethereum)

      d.   cliff under (Monero)

      e.   column scout (Bitcoin)

      f.   crucial have (Bitcoin)

      g.   few spread (Monero)

      h.   hat castle (Bitcoin)

      i.   object gold (Monero)

      j.   open east (Bitcoin)

      k.   orphan sun (Monero)

      l.   physical develop (Monero)

      m. picture garbage (Litecoin)

      n.   rhythm east (Litecoin)

      o.   sauce enter (UNKNOWN)

      p.   subject west (Bitcoin)

      q.   swap unit (Bitcoin)

      r.   symbol walnut (Bitcoin)

      s.   tip trend (Monero)

      t.   volcano terminal (Monero)

(collectively, hereafter, the "SUBJECT ASSETS").

4.    As set forth below, I submit that there is probable cause to believe that the SUBJECT ASSETS are property constituting, or derived from, proceeds obtained, directly or indirectly, as a result of violations of 21 U.S.C. § 841(a)(1) (distribution and possession with intent to distribute a controlled substance) and § 846 (conspiracy to distribute and possess with intent to distribute, controlled substances, including distribution by means of the Internet). The SUBJECT ASSETS are therefore subject to forfeiture to the United States under 21 U.S.C. § 853(a)(1).

5.    I further submit that there is probable cause to believe that the SUBJECT ASSETS constitute (1) moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished in exchange for a controlled substance, in violation of the Controlled Substances Act ("CSA"); (2) proceeds traceable to such an exchange; or (3) moneys, negotiable instruments, or securities used or intended to be used to facilitate a violation of the CSA. The SUBJECT ASSETS are therefore subject to forfeiture to the United States under 21 U.S.C. § 881(a)(6).

6.    I additionally submit there is probable cause to believe that the SUBJECT ASSETS constitute property involved in a money laundering transaction or money laundering conspiracy, in violation of 18 U.S.C. § 1956, or are traceable to such property. The SUBJECT ASSETS are therefore subject to forfeiture to the United States pursuant to 18 U.S.C. §§ 981(a)(1)(A) (civil forfeiture) and 982(a)(1) (criminal forfeiture).

## FORFEITURE AND SEIZURE AUTHORITY

7.    As to civil forfeiture, under 21 U.S.C. § 881(a), "[t]he following shall be subject to forfeiture to the United States and no property right shall exist in them: … (6) All moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished

4

by any person in exchange for a controlled substance or listed chemical in violation of this subchapter, all proceeds traceable to such an exchange, and all moneys, negotiable instruments, and securities used or intended to be used to facilitate any violation of this subchapter." Property subject to civil forfeiture under 21 U.S.C. § 881(a) may be seized pursuant to 18 U.S.C. § 981(b) (by 21 U.S.C. § 881(b)). Under 18 U.S.C. § 981(a)(1)(A), "[a]ny property, real or personal, involved in a transaction in violation of [18 U.S.C. § 1956], or any property traceable to such property" is subject to forfeiture to the United States. Property subject to civil forfeiture under 18 U.S.C. § 981(a)(1) may be seized pursuant to 18 U.S.C. § 981(b).

8.     As to criminal forfeiture, under 21 U.S.C. § 853(a), "[a]ny person convicted of a violation of this subchapter or subchapter II of this chapter punishable by imprisonment for more than one year shall forfeit to the United States, irrespective of any provision of State law [*inter alia*]—(1) any property constituting, or derived from, any proceeds the person obtained, directly or indirectly, as the result of such violation; [and] (2) any of the person's property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, such violation." As property subject to criminal forfeiture under 21 U.S.C. § 853(a), the SUBJECT ASSETS may be seized pursuant to 21 U.S.C. § 853(f).

9.     Under 18 U.S.C. § 982(a)(1), "[t]he court, in imposing sentence on a person convicted of an offense in violation of [18 U.S.C. § 1956], shall order that the person forfeit to the United States any property, real or personal, involved in such offense, or any property traceable to such property." As property subject to criminal forfeiture under 18 U.S.C. § 982(a)(1), the SUBJECT ASSETS may be seized pursuant to 21 U.S.C. § 853(f) (by 18 U.S.C. § 982(b)(1)).

10.     With respect to seizure, 21 U.S.C. § 853(f) specifically provides that a court may issue a criminal seizure warrant when it "determines that there is probable cause to believe that the

5

property to be seized would, in the event of conviction, be subject to forfeiture and that a[]
[protective] order under [21 U.S.C. § 853(e)] may not be sufficient to assure the availability of the
property for forfeiture . . . ." As set forth further below, there is a substantial risk that the SUBJECT
ASSETS will be withdrawn, moved, dissipated, or otherwise become unavailable for forfeiture
unless immediate steps are taken to secure them. As a form of cryptocurrency, the SUBJECT
ASSETS are inherently portable and fungible. I therefore submit that a protective order under 21
U.S.C. § 853(e) would not be sufficient to assure that the SUBJECT ASSETS will remain available
for forfeiture.

11.     Furthermore, pursuant to 18 U.S.C. § 981(b)(3), "[n]otwithstanding the provisions
of rule 41(a) of the Federal Rules of Criminal Procedure, a seizure warrant may be issued pursuant
to this subsection by a judicial officer in any district in which a forfeiture action against the
property may be filed under section 1355(b) of title 28, and may be executed in any district in
which the property is found, or transmitted to the central authority of any foreign state for service
in accordance with any treaty or other international agreement."

12.     For the reasons listed above, the United States seeks a combined criminal and civil
seizure warrant, authorizing law enforcement to seize the SUBJECT ASSETS and preserve them
pending further forfeiture proceedings.

## BACKGROUND ON THE DARK WEB & CRYPTOCURRENCY

13.     Based on my training, research, education, and experience, I am familiar with the
following relevant terms and definitions:

> a.   Cryptocurrency, a type of virtual currency, is a decentralized, peer-to peer,
> network-based medium of value or exchange that may be used as a substitute for fiat
> currency to buy goods or services or exchanged for fiat currency or other cryptocurrencies.

6

Examples of cryptocurrency are Bitcoin, Litecoin, and Ether. Cryptocurrency can exist digitally on the Internet, in an electronic storage device, or in cloud-based servers. Although not usually stored in any physical form, public and private keys (described below) used to transfer cryptocurrency from one person or place to another can be printed or written on a piece of paper or other tangible object. Cryptocurrency can be exchanged directly person to person, through a cryptocurrency exchange, or through other intermediaries. Generally, cryptocurrency is not issued by any government, bank, or company; it is instead generated and controlled through computer software operating on a decentralized peer-to-peer network. Most cryptocurrencies have a "blockchain," which is a distributed public ledger, run by the decentralized network, containing an immutable and historical record of every transaction.[1] Cryptocurrency is not illegal in the United States.

b. Bitcoin[2] ("BTC") is a type of cryptocurrency. Payments or transfers of value made with bitcoin are recorded in the Bitcoin blockchain and thus are not maintained by any single administrator or entity. As mentioned above, individuals can acquire bitcoin through exchanges (i.e., online companies which allow individuals to purchase or sell cryptocurrencies in exchange for fiat currencies or other cryptocurrencies), bitcoin ATMs, or directly from other people. Individuals can also acquire cryptocurrencies by "mining." An individual can "mine" bitcoins by using his/her computing power to solve a complicated algorithm and verify and record payments on the blockchain. Individuals are

---

[1] Some cryptocurrencies operate on blockchains that are not public and operate in such a way to obfuscate transactions, making it difficult to trace or attribute transactions.

[2] Since Bitcoin is both a cryptocurrency and a protocol, capitalization differs. Accepted practice is to use "Bitcoin" (singular with an uppercase letter B) to label the protocol, software, and community, and "bitcoin" (with a lowercase letter b) to label units of the cryptocurrency. That practice is adopted here.

rewarded for this task by receiving newly created units of a cryptocurrency. Individuals can send and receive cryptocurrencies online using many types of electronic devices, including laptop computers and smart phones. Even though the public addresses of those engaging in cryptocurrency transactions are recorded on a blockchain, the identities of the individuals or entities behind the public addresses are not recorded on these public ledgers. If, however, an individual or entity is linked to a public address, it may be possible to determine what transactions were conducted by that individual or entity. Bitcoin transactions are therefore sometimes described as "pseudonymous," meaning that they are partially anonymous. And while it's not completely anonymous, Bitcoin allows users to transfer funds more anonymously than would be possible through traditional banking and credit systems.

c. Cryptocurrency is stored in a virtual account called a wallet. Wallets are software programs that interface with blockchains and generate and/or store public and private keys used to send and receive cryptocurrency. A public key or address is akin to a bank account number, and a private key is akin to a PIN or password that allows a user the ability to access and transfer value associated with the public address or key. To conduct transactions on a blockchain, an individual must use the public address (or "public key") and the private address (or "private key"). A public address is represented as a case-sensitive string of letters and numbers, 26–35 characters long. Each public address is controlled and/or accessed through the use of a unique corresponding private key—the cryptographic equivalent of a password or PIN—needed to access the address. Only the holder of an address' private key can authorize any transfers of cryptocurrency from that address to another cryptocurrency address.

d. Although cryptocurrencies such as Bitcoin have legitimate uses, cryptocurrency is also used by individuals and organizations for criminal purposes such as money laundering and is an oft-used means of payment for illegal goods and services on hidden services domains operating on the Tor network. By maintaining multiple wallets, those who use cryptocurrency for illicit purposes can attempt to thwart law enforcement's efforts to track purchases within the dark web marketplaces. As of August 22, 2025, one bitcoin is worth approximately $112,530.10, though the value of bitcoin is generally much more volatile than that of fiat currencies.

e. Exchangers and users of cryptocurrencies store and transact their cryptocurrency in a number of ways, as wallet software can be housed in a variety of forms, including on a tangible, external device ("hardware wallet"), downloaded on a PC or laptop ("desktop wallet"), with an Internet-based cloud storage provider ("online wallet"), as a mobile application on a smartphone or tablet ("mobile wallet"), printed public and private keys ("paper wallet"), and as an online account associated with a cryptocurrency exchange. Because these desktop, mobile, and online wallets are electronic in nature, they are located on mobile devices (e.g., smart phones or tablets) or at domains that users can access via a computer, smart phone, or any device that can search the Internet. Moreover, hardware wallets are located on some type of external or removable media device, such as a USB thumb drive or other commercially available device designed to store cryptocurrency (e.g. Trezor, Keepkey, or Nano Ledger). In addition, paper wallets contain an address and a QR code[3] with the public and private key embedded in the code. Paper wallet keys are not

---

[3] A QR code is a matrix barcode that is a machine-readable optical label.

stored digitally. Wallets can also be backed up into, for example, paper printouts, USB drives, or CDs, and accessed through a "recovery seed" (random words strung together in a phrase) or a complex password. Additional security safeguards for cryptocurrency wallets can include two-factor authorization (such as a password and a phrase). I also know that individuals possessing cryptocurrencies often have safeguards in place to ensure that their cryptocurrencies become further secured in the event that their assets become potentially vulnerable to seizure and/or unauthorized transfer.

       f.   Bitcoin "exchangers" and "exchanges" are individuals or companies that exchange bitcoin for other currencies, including U.S. dollars. According to the Department of Treasury, Financial Crimes Enforcement Network ("FinCEN") Guidance issued on March 18, 2013, virtual currency administrators and exchangers, including an individual exchanger operating as a business, are considered money services businesses.[4] Such exchanges and exchangers are required to register with FinCEN and have proper state licenses (if required under applicable state law). From my training and experience, I know that registered money transmitters are required by law to follow Bank Secrecy Act anti-money laundering ("AML") regulations, "Know Your Customer" ("KYC") protocols, and other verification procedures similar to those employed by traditional financial institutions. For example, FinCEN-registered cryptocurrency exchangers often require customers who want to open or maintain accounts on their exchange to provide their name, address, phone number, and/or the full bank account and routing numbers that the customer links to his/her

---

[4] *See* "Application of FinCEN's Regulations to Person Administering, Exchanging, or Using Virtual Currencies," *available at* https://www.fincen.gov/resources/statutes-regulations/guiadance/application-fincens-regulations-persons-administering.

exchange account. As a result, there is significant market demand for illicit cryptocurrency-for-fiat currency exchangers, who not only lack AML or KYC protocols but often advertise their ability to offer customers stealth and anonymity. These illicit exchangers often exchange fiat currency for cryptocurrencies, such as by meeting customers in person or by shipping fiat currency through the mail. Due to the illicit nature of these transactions and their customers' desire for anonymity, such exchangers are frequently able to charge a higher exchange fee, often as high as 9-10% (in contrast to registered and BSA-compliant exchangers, who may charge fees as low as 1-2%).

g.      Some companies offer cryptocurrency wallet services which allow users to download a digital wallet application onto their smart phone or other digital device. A user typically accesses the wallet application by inputting a user-generated PIN code or password. Users can store, receive, and transfer cryptocurrencies via the application; however, many of these companies do not store or otherwise have access to their users' funds or the private keys that are necessary to access users' wallet applications. Rather, the private keys are stored on the device on which the wallet application is installed (or any digital or physical backup private key that the user creates). As a result, these companies generally cannot assist in seizing or otherwise restraining their users' cryptocurrency. Nevertheless, law enforcement could seize cryptocurrency from the user's wallet directly, such as by accessing the user's smart phone, accessing the wallet application, and transferring the cryptocurrency therein to a law enforcement-controlled wallet. Alternatively, where law enforcement has obtained the recovery seed for a wallet (see above), investigators may be able to use the recovery seed phrase to recover or reconstitute the wallet on a different digital device and subsequently transfer

11

cryptocurrencies held within the new wallet to a law enforcement-controlled wallet.

**PROBABLE CAUSE**

14.     In March of 2025, investigators with the Columbus CNJTF observed a domain named "rmp.supply" on a known drug trafficker's encrypted messenger profile. The known drug trafficker had the domain "pinned" in the "bio" section of their profile, indicating that they were highlighting and bringing attention to this domain. When investigators navigated to "rmp.supply," they were automatically redirected to a new domain "btcpay837598.lndyn.com/apps/2fHP5UhEZp6s2tPf3f49qzMiiRv2/pos." This domain's content showed a drug marketplace named ROCKY MOUNTAIN CONNECTIONS, which offered several types of drugs for sale, such as methamphetamine, cocaine, illicit pharmaceuticals, DMT, LSD, mushrooms, MDMA, ketamine, cannabis, and various other drugs. Although the domain is setup to facilitate the sale of drugs, the domain mirrors that of a normal online store selling legal goods, in that customers can navigate the webpage, view drugs by category, and browse listings that each include a picture of the drug, its name, and a price to quantity breakdown. Below is an example of ROCKY MOUNTAIN CONNECTIONS'webpage:



15. ROCKY MOUNTAIN CONNECTIONS uses a service called "BTCPay" to process transactions, in which customers can choose to pay with Bitcoin, Litecoin, or Monero. BTCPay is an open-source cryptocurrency processing system, much like a point-of-sale system or cash register in a brick and mortar style store. Once a customer makes a purchase of drugs from ROCKY MOUNTAIN CONNECTIONS, BTCPay automatically provides a cryptocurrency address, and the customer is expected to pay the required amount, and if successful, is provided an order and invoice number. BTCPay is not "custodial," in that, BTCPay personnel do not control the cryptocurrency or take custody of it. BTCPay is simply a payment processing system that users can setup to take cryptocurrency payments. The user setting up the BTCPay wallet is the custodian

of the cryptocurrency, essentially meaning that it is a software wallet and that the user is likely provided the private key and seed phrases to the wallet. It is likely that BTCPay charges a fee in exchange for allowing the user(s) to use its system.

16.     CNJTF investigators have conducted four undercover purchases of drugs from ROCKY MOUNTAIN CONNECTIONS, using bitcoin (BTC) cryptocurrency to pay for the drugs and shipping via ROCKY MOUNTAIN CONNECTIONS' BTCPay payment processing system. All four purchases were shipped from the western Oregon area of the United States and were all delivered and seized in the Columbus, Ohio area. The first undercover purchase took place in March of 2025, when investigators purchased/seized 185.53 grams of counterfeit methamphetamine pills and 1.57 grams of LSD. The second purchase took place in April of 2025, when investigators purchased/seized 29.09 grams of cocaine and 23.22 grams of alprazolam. The third purchase took place in June of 2025, when investigators purchased/seized 420.35 grams of counterfeit methamphetamine pills. The fourth purchase took place in August of 2025, when investigators purchased/seized 911 grams of lab-confirmed methamphetamine pills. Based on my training and experience, I know that LSD is a federally controlled schedule I substance, methamphetamine and cocaine are schedule II controlled substances, and alprazolam is a schedule IV controlled substance.

17.     All four undercover purchases were shipped by ROCKY MOUNTAIN CONNECTIONS using the United States Postal Service (USPS) and had nearly identical "stealth" techniques and packaging. "Stealth" refers to the manner an online drug vendor ships drugs in the mail, specifically the level of concealing materials the vendor hides within the package along with the drugs in order to make the package look and feel like a normal USPS package. The return address that was listed on the label affixed to the package that contained the first undercover

purchase (containing LSD and methamphetamine) was "HARRY's 2201 Lloyd Center, Portland, OR." The return address that was listed on the label affixed to the package that contained the second undercover purchase (containing cocaine and alprazolam) was "APPLE-A-DAY 293 Valley River Center, Eugene, OR." The return address that was listed on the label affixed to the package that contained the third undercover purchase (containing methamphetamine) was "COMMON HEALTH 12000 SE 82nd Avenue, Happy Valley, OR." The return address that was listed on the label affixed to the package that contained the fourth undercover purchase (containing 911.1 grams of methamphetamine) was "SCHOOL ZONE, 2201 Lloyd Ctr., Portland, OR 97232."

18.     On the ROCKY MOUNTAIN CONNECTIONS domain, investigators observed a link to a page that included a contact information section for ROCKY MOUNTAIN CONNECTIONS. The page listed the contact email address for ROCKY MOUNTAIN CONNECTIONS as "rockymtnpsych@protonmail.com." In addition to the email address, there were several other references on the domain indicating that ROCKY MOUNTAIN CONNECTIONS used to be named "ROCKY MOUNTAIN PSYCHEDELICS." Below is an example from ROCKY MOUNTAIN CONNECTIONS' contact information page:

## Rocky Mountain Psychedelic information

### Policy and Faq

**1. Payment Policy**
Accepted Payment Methods: Currently accept BTC, LTC and XMR. Doesn't matter where the cyprto comes from, if you are able to send BTC, etc - it will work.

**2. Shipping Policy**

**Processing Time:** Orders are processed within 1-2 business days. Don't ask when your pack went out. I don't care to discuss things that can ruin OPSEC - You will be ignored.

**Shipping Methods:** At this time, USA to USA only, USPS. I do not do Express shipping - don't ask.

**Shipping Costs:** Shipping cost is $15, make sure to add it to your cart when checking out.

**If package is returned to sender:** Due to incorrect address information provided, will not reship. If we mess up your address, we will reship. If pack is seized (zero at this time), we will reship. If USPS does not scan in a package and loses it, after 4 weeks of no product movement, you can pay for half of the original order and we will cover the other half out of pocket.

**3. Tracking Policy**
Tracking is not provided. If you have not received your order AFTER 14 days, please reach out so that we may locate your package.
Make sure to sign up for informed delivery through https://www.usps.com/manage/informed-delivery.htm?ftag=MSF0951a1&msockid=2b8a80c2b80f640d32509446b9b4657a (know that informed delivery is not always accurate - do not come yell at me because it isn't updated)

19.     Per Colorado Secretary of State business records, Jesse WASSON (the SUBJECT)

incorporated a business named "Rocky Mountain Psychedelics LLC" on September 20, 2023, and dissolved it on June 21, 2024. Per open-source research, the SUBJECT is married to Shea WASSON and lives with her at 5846 Flintwood Road, Unit B, Parker, CO.

20.     Through postal data analysis/research, investigators located a USPS online account with a listed email address of "rockymtnpsych@protonmail.com," a telephone number of (303) 474-2626, the name "Emily Breslin," and an address of 586 Grove Street, Lebanon, OR, that was created in March of 2025. Lebanon, Oregon is nearby the return addresses listed on the shipping labels of undercover purchases made by the CNJTF. Per an administrative subpoena served on Castle Property Management (the company that oversees/rents out the property of 586 Grove Street, Lebanon, OR), the listed tenants (since December of 2023) of 586 Grove Street (as of June 17, 2025) were Amandra HEFFELFINGER (seen as "Amandra Sansone") and Jennifer BLAKE. HEFFELFINGER's listed telephone number with Castle Property Management was (503) 888-8288, and BLAKE's listed telephone number was (707) 365-5526. As explained above and within, the investigation has indicated that HEFFELGINGER and BLAKE used to live at 586 Grove Street and that they are working to send drug packages related to orders made from the ROCKY MOUNTAIN CONNECTIONS domain. Per a Gmail search warrant served on Google for content associated with HEFFELFINGER's Gmail account, investigators know that BLAKE and HEFFELFINGER moved from 586 Grove Street, Lebanon, OR to 24 Grove Street, Lebanon, OR, in May of 2025. Investigators know they purchased the residence per Linn County, OR Geographic Information Systems (GIS).

21.     As the case has progressed, investigators have observed fewer references to ROCKY MOUNTAIN "PSYCHEDELICS" and more references to "CONNECTIONS." As a result, investigators believe that ROCKY MOUNTAIN CONNECTIONS used to be called

ROCKY MOUNTAIN PSYCHEDELICS, and it has been slowly updating its monikers to reflect such. Law enforcement has identified additional connections between ROCKY MOUNTAIN CONNECTIONS, the SUBJECT, Shea WASSON, HEFFELFINGER, and BLAKE.

22.     Per an administrative subpoena served on T-Mobile in June of 2025 for toll data and basic subscriber information, the listed subscriber for both the HEFFELFINGER's telephone number and BLAKE's telephone number is "Amandra Sansone" at "345 Taylor Drive, Newberg, OR." Per open-source research, "Sansone" is a last name for HEFFELFINGER from a previous relationship, and 345 Taylor Drive is a previous listed address for her. Service for the HEFFELFINGER's telephone number began in July of 2005, while service for BLAKE's telephone number began in December of 2024.

23.     Again, per open-source information and the Google search warrant return for content associated with HEFFELFINGER's Gmail account, HEFFELFINGER appears to be in a relationship with BLAKE and that they moved to 24 Grove Street, Lebanon, OR in May of 2025.

24.     Per administrative subpoenas served on T-Mobile in August of 2025 for toll data and basic subscriber information, the listed subscriber for both (303) 564-9029 and (720) 233-5968 is Shea WASSON at 5846 Flintwood Road, Parker, CO. Per a federal grand jury subpoena served onto Payward Interactive, Inc. (better known as cryptocurrency exchange "Kraken"), the SUBJECT listed her telephone number as (303) 564-9029, and Shea WASSON listed her telephone number as (720) 233-5968.

25.     Per toll analysis, the SUBJECT and Shea WASSON both contact each other frequently, approximately two-hundred sixty (260) times from April to August of 2025. BLAKE and HEFFELFINGER also frequently contact each other, approximately three-hundred thirty-six (336) times from May to August of 2025. Also relevant here, the SUBJECT is in contact with

BLAKE, approximately one-hundred one (101) times from April of 2025 to August of 2025, likely regarding ROCKY MOUNTAIN CONNECTIONS' drug operations and orders.

26.     Per an administrative subpoena served on Southwest Airlines, HEFFELFINGER, BLAKE, and the SUBJECT were all in Las Vegas, Nevada, from May 4, 2025, to May 6, 2025. Per a Gmail search warrant for HEFFELFINGER's Gmail account served on Google, the reason for the travel was for a wedding between BLAKE and HEFFELFINGER. Investigators located numerous group pictures from the wedding that showed BLAKE, HEFFELFINGER, and the SUBJECT together. In addition, Shea WASSON was also listed on the RSVP for the wedding as being the "mixologist" for the event.

27.     In June of 2025, CNJTF investigators conducted the third undercover purchase of 420.35 grams of counterfeit methamphetamine pills from ROCKY MOUNTAIN CONNECTIONS, using Bitcoin to pay for the drugs and shipping. The ROCKY MOUNTAIN CONNECTIONS domain directed the undercover investigator to deposit the Bitcoin into a Bitcoin wallet ending in "rlq0." Several hours later, the Bitcoin was traced to another Bitcoin wallet ending in "3etg," where it was combined with other funds, totaling $6,936 worth of BTC (at that time). Several hours after that, the Bitcoin was moved to a Bitcoin wallet ending in "J3r2," which is a Bitcoin wallet associated with a cryptocurrency swapping service called "ChangeNow," indicating the user moved the Bitcoin with the intent to "swap" the Bitcoin with another cryptocurrency. ChangeNow is a "swapping service," which allows users to efficiently trade one cryptocurrency for another. For example, a user could take $100 worth of Monero, send it to ChangeNow and trade it for $100 (minus a fee) worth of another cryptocurrency, such as Bitcoin. Per an administrative subpoena served on ChangeNow, the Bitcoin used to purchase the counterfeit methamphetamine pills was swapped to Monero. Based on my training and experience, this is a

popular tactic amongst online drug vendors and cryptocurrency money launderers since it effectively conceals the source and nature of funds by obfuscating the flow of the cryptocurrency, since Monero is a privacy-based cryptocurrency that keeps transaction data "off-chain" (unlike Bitcoin or Litecoin), meaning that investigators cannot effectively trace it. Monero is favored by online drug vendors due to this, and Monero has extremely little legal purpose/use. The value of Monero can fluctuate like any cryptocurrency, or a stock, but it is not considered a popular investment option. Per that same administrative subpoena, ChangeNow provided the IP address that was used to execute the swap as 216.147.125.226 and provided the date/time for the swap as approximately 18:54:06 UTC on June 17, 2025. Per a federal grand jury subpoena served on Starlink (the internet service provider that maintains IP address 216.147.125.226), the customer assigned IP address 216.147.125.226 with source port 50683 on June 17, 2025 at 18:54:12 UTC is listed as Shea WASSON at 5846 Flintwood Road, Unit B, Parker, CO. Furthermore, investigators are aware of a Discord account that lists "rockymtnpsych@protonmail.com" as the account's email address. Per a federal 2703(d) court order, on June 13, 2025, at 12:47:09 UTC, the Discord account associated with "rockymtnpsych@protonmail.com" logged in using IP address 216.147.125.226. Per that same federal grand jury subpoena referenced above, Shea WASSON's assigned IP address at that time was also 216.147.125.226 with source port 52793. It should be noted that Starlink uses a system that allows anywhere from 50 to 100 customers to use the same IPv4 address at the same time. However, the odds that one of those 50 to 100 customers were also using their Starlink internet service to access ChangeNow to initiate a cryptocurrency swap on June 17, 2025 at 18:54:12 UTC and that one of those 50 to 100 customers was logging into Discord on June 13, 2025 at 12:47:09 UTC, each at the same moment as Shea WASSON's internet router is extremely unlikely.

28.     Throughout July and August of 2025, investigators have served Payward Interactive, Inc. with federal grand jury subpoenas for information regarding HEFFELFINGER's, BLAKE's, the SUBJECT's, and Shea WASSON's Kraken accounts. Upon viewing the responses, investigators observed that all four individuals have used Kraken to engage in suspicious activity that is indicative of money laundering (examples below). In addition, the SUBJECT listed her contact email address with her old Kraken account as "rockymtnpsych@protonmail.com." Kraken offers customers the ability to purchase cryptocurrency, send/receive cryptocurrency to/from other users (whether they have Kraken accounts or not), and/or cash out their cryptocurrency in exchange for U.S. currency, along with other options.

29.     HEFFELFINGER's and BLAKE's Kraken accounts were both activated in early 2025 (January and February of 2025), and both accounts have exclusively used Monero. From January of 2025 to July of 2025, BLAKE received 172.80 Monero over the course of fifteen deposits. After nearly every deposit, BLAKE exchanged the Monero for U.S. currency (totaling approximately $46,345) within forty-eight hours. The U.S. currency was then wired to a Bank of America account within twenty-four hours of receiving the Monero. From February to July of 2025, HEFFELFINGER received 233.59 Monero over the course of fifteen deposits. After nearly every deposit, HEFFELFINGER exchanged the Monero for U.S. currency (totaling approximately $66,940) within forty-eight hours. The U.S. currency was then wired to a Bank of America account within twenty-four hours of receiving the Monero. The Monero deposits appear to be indicative of being paid like an employee, since the amounts are somewhat similar (thirteen of the fifteen deposits were between 12 and 18 Monero) and occurred on a schedule (usually every three weeks or so). This activity is not indicative of investing (since the Monero is received from an outside source and is not held for a long period of time) and appears to be indicative of money laundering,

as they appear to be using Monero to conceal the source of the funds before cashing it out into their regular bank accounts. Moreover, the activity by BLAKE and HEFFELFINGER is indicative of them sending packages on behalf of ROCKY MOUNTAIN CONNECTIONS' drug operations and then getting paid for it.

30.     The SUBJECT's older Kraken account was activated in November of 2023, but she didn't start receiving Monero on the account until May of 2024. The SUBJECT's second, newer account was activated in July of 2025. The SUBJECT claimed to Kraken support that she had changed her phone number and needed a new account. The SUBJECT has received 920.45 Monero, 0.74696990 Bitcoin, and 0.09083633 Bitcoin Cash from May of 2024 to July of 2025. After nearly every deposit, the SUBJECT began exchanging the Monero, Bitcoin, and Bitcoin Cash for U.S. currency (totaling approximately $233,913) within forty-eight hours. Nearly all the U.S. currency was then wired to bank accounts, with less than $3,000 in U.S. currency remaining between both of the SUBJECT's accounts (at the time the subpoena was served). This activity is not indicative of investing (since the Monero and other cryptocurrency are received from an outside source and are not held for a long period of time) and appears to be indicative of money laundering, as the SUBJECT appears to be using Monero to conceal the source of the funds (drug dealing) before cashing it out into her regular bank accounts.

31.     Shea WASSON's Kraken account was activated in October of 2024. Shea WASSON has received 437.16 Monero from October of 2024 to July of 2025. After nearly every deposit, Shea WASSON began exchanging the Monero for U.S. currency (totaling approximately $106,936) within forty-eight hours. Nearly all the U.S. currency was then wired to bank accounts, with less than $4,000 remaining in Shea WASSON's account (at the time the subpoena was served). This activity is not indicative of investing (since the Monero is received from an outside

source and is not held for a long period of time) and appears to be indicative of money laundering, as Shea WASSON appears to be using Monero to conceal the source of the funds before cashing it out into her regular bank accounts.

32.     The above amounts of money further do not appear to correspond to the co-conspirators' suspected income levels. Per a federal grand jury subpoena served on Wells Fargo for financial records associated with HEFFELFINGER and BLAKE, investigators know that HEFFELFINGER and BLAKE are school psychologists, since investigators observed an application for an auto loan dated August 30, 2024. The returned financial records from Wells Fargo specifically included HEFFELFINGER's and BLAKE's employment and salary information as part of the loan application. Investigators observed that HEFFELFINGER reported an income of $69,996 per year from her employment with the Linn-Benton-Lincoln Education School District. BLAKE reported an income of $55,992 per year from her employment with the Eugene 4J Student Services Department. Investigators also have served Bank of America for financial records associated with HEFFELFINGER and BLAKE and have observed payroll deposits from the respective school districts into their accounts that appear to generally coincide with their reported income to Wells Fargo. Per open-source research, investigators know that Shea WASSON is a self-described, self-employed entrepreneur who owns a mobile pop-up bar called "Shea Mobile Bespoke Bar" (much like a food truck, but for alcoholic beverages). Per the Colorado Secretary of State, Shea WASSON is the listed registered agent of a business named "Beerspoke Experience" and lists 1991 S. Wolff Street, Denver, CO as the physical and mailing address. The business is (at time of writing) currently listed as "expired." Investigators have not been able to determine if the SUBJECT has legitimate employment. Per federal grand jury subpoenas served on Kraken, she listed her occupation as "self-employed" on her first Kraken

account and then listed her occupation as "hospitality" on her second, newer Kraken account.

33. Per open-source research, investigators do not believe that Shea WASSON takes cryptocurrency as a payment method for her business, and it is even less likely that she specifically accepts Monero cryptocurrency as payment due to the hassle it takes to acquire it, lack of popularity amongst regular everyday consumers, and lack of mainstream payment processing that supports it. It's very likely that Shea WASSON takes cash and/or credit card payments at her legitimate business. As a result, it's suspicious that Shea WASSON is receiving large amounts of Monero, and appearing to launder it, in an identical manner to known drug traffickers, such as the SUBJECT, HEFFELFINGER, and BLAKE.

34. Furthermore, investigators served Google with a search warrant for Shea WASSON's Gmail account "shea.wasson925@gmail.com" in August of 2025. When observing the return, investigators observed numerous Google searches for "snope.io" and "temp.pm," which are encrypted messenger domains that ROCKY MOUNTAIN CONNECTIONS encourages users to use on the ROCKY MOUNTAIN CONNECTIONS domain when giving them your name and mailing address. Some of the searches had complex page paths (for example, "temp.pm/&usg+AOvVaw0G2ADU339qoVlsmSkuDkAf"), which indicates that Shea WASSON was opening or making an encrypted message, since users of "temp.pm" and "snope.io" use the domain to type a message, then convert the message into an encrypted message that is accessible via a link that resembles "temp.pm/&usg+AOvVaw0G2ADU339qoVlsmSkuDkAf." Investigators also observed Google searches for "peyote" and "peyote care." Based on my training and experience, I know that peyote is a federally controlled schedule I substance.

35. Investigators served Google with a search warrant for information associated with a Gmail account belonging to HEFFELFINGER and served an Apple search warrant for

information associated with the iCloud account belonging to BLAKE. Investigators located the following in BLAKE'S iCloud—cryptocurrency addresses, cryptocurrency transactions hashes, and saved contact cards for the SUBJECT and Shea WASSON. Investigators located the following in HEFFELFINGER's Gmail account—pictures of bulk amounts of vacuum-sealer bags, evidence of usage on "cryptopostage.info" for bulk amounts of third-party postage paid with Bitcoin, and pictures of packages received at 586 Grove Street bearing a fictious name.

36. Investigators also served Apple with a search warrant for content and information associated with the iCloud account belonging to the SUBJECT. Investigators found the following relevant information in the SUBJECT's iCloud—pictures of books and pdfs about how to be a drug trafficker (many specifically about how to be an online drug vendor, including titles such as "Best Resources for Trappers," "DontLacknSlip," and "USPSSecrets"), artwork for ROCKY MOUNTAIN PSYCHEDELICS, a "temp.pm" message that appeared to be sent to the SUBJECT where the message sender addressed her as "Rocky" and inquired about placing a drug order, and cryptocurrency seed phrases, associated with the SUBJECT ASSETS.

37. The investigation has indicated that the SUBJECT, Shea WASSON, HEFFELFINGER, and BLAKE are drug traffickers that conspire together and constitute (at least in part) the ROCKY MOUNTAIN CONNECTIONS drug trafficking organization (DTO). Investigators also know that all drug payments made to ROCKY MOUNTAIN CONNECTIONS are made in cryptocurrency, specifically Bitcoin, Litecoin, or Monero. Investigators know that the SUBJECT and/or Shea WASSON have taken Bitcoin used to make a purchase of suspected counterfeit methamphetamine pills from ROCKY MOUNTAIN CONNECTIONS and have swapped it to Monero, effectively laundering it since further movement of the money is concealed due to the nature of Monero. Investigators also know that Shea WASSON is listed on the customer

contact information for the internet service at Shea's and the SUBJECT's residence that was used to execute that swap. Finally, investigators know that the SUBJECT, Shea WASSON, HEFFELFINGER, and BLAKE are appearing to receive Monero, launder it, and wire it to their respective bank account(s), all in a nearly identical manner.

38.     In August of 2025, the ROCKY MOUNTAIN CONNECTIONS official feed on encrypted messenger app "Potato" announced that ROCKY MOUNTAIN CONNECTIONS would be on vacation from August 1-13 and that the shop would not be shipping orders during that time. This feed is from the official ROCKY MOUNTAIN CONNECTIONS account that is advertised on the ROCKY MOUNTAIN CONNECTIONS domain and provides updates about shop closures, new stock, availability of products, and news. However, ROCKY MOUNTAIN CONNECTIONS stated that "pints" and "breakdown weed" would not be affected by the shop closure and could still be ordered and fulfilled as normal. Based on my training and experience, along with my knowledge of the specific case, "pints" refer to promethazine and codeine syrup and "breakdown weed" refers to cannabis available for purchase in ounce quantities. Based on my training and experience, I know that cannabis is a federally controlled schedule I substance, and promethazine, when combined with codeine, is considered a schedule V substance. Both products are available for purchase from the ROCKY MOUNTAIN CONNECTIONS domain. Investigators previously served T-Mobile with prospective geolocation (ping) warrants on BLAKE's and HEFFELFIGNER's cellular devices, starting on July 10, 2025. Throughout a majority of the ping's duration, BLAKE and HEFFELFINGER have been located in the Lebanon, Oregon area and surrounding towns (Eugene, Corvallis, Albany, etc.), but on August 3, 2025, HEFFELFINGER appeared to fly from Eugene, Oregon to Phoenix, Arizona, with a brief stop in Las Vegas, Nevada. Then, on August 6, 2025, BLAKE appeared to leave via a vehicle from

Lebanon, Oregon enroute to Vacaville, California, around the same time HEFFELFINGER began to appear to drive from Phoenix, Arizona to Vacaville, California. After both spending time in Vacaville, California, the two returned to Lebanon, Oregon, on August 10, 2025.

39.     On August 18, 2025, investigators conducted an undercover purchase of counterfeit methamphetamine pills from the ROCKY MOUNTAIN CONNECTIONS domain. Several hours after the order was placed, at 2:20 p.m. (all times in this paragraph are in Pacific Daylight Time), investigators with the DEA Eugene Resident Office and USPIS Grants Pass Office observed BLAKE appear from 24 Grove Street with at least four large tote bags and load her 2017 gray Hyundai Santa Fe with them. A few minutes later, BLAKE and HEFFELFINGER entered the Santa Fe with their dog and departed the area. At approximately 2:34 p.m., the Santa Fe arrived at the Mr. Nice Guy cannabis dispensary at 700 Park Street, Lebanon, OR. At approximately 2:39 p.m., investigators observed HEFFELFINGER appear from Mr. Nice Guy, enter the Santa Fe's passenger seat, and depart the area. A few minutes later, the Santa Fe arrived at the USPS post office located at 55 Walker Road, Lebanon, OR. Investigators observed BLAKE remove several tote bags from the Santa Fe, then enter the post office. Approximately eight minutes later, investigators observed BLAKE exit the post office with empty bags, enter the Santa Fe, and depart the area. Investigators then followed the Santa Fe to Sweet Home, OR, where the Santa Fe once again arrived at a USPS post office located at 1303 Long Street, Sweet Home, OR at 3:07 p.m. BLAKE repeated what she did at the Lebanon post office, taking tote bags from the Santa Fe into the post office, then coming out of the post office empty-handed minutes later, and departing the area. During this surveillance, the pings operating on HEFFELFINGER's and BLAKE's cell phones mirrored their locations. Based on my training and experience, I know that this suspicious behavior is indicative especially of online drug vendors. Visiting numerous post offices and

26

dropping off large amounts of packages when not engaged in a legal/normal online business is suspicious behavior. USPIS Grants Pass seized two packages that BLAKE appeared to drop off, one from each post office that she was observed visiting.

40. The next day, USPIS Grants Pass applied for, and was granted a search warrant drawn out of the District of Oregon to search the contents of two packages, one that was dropped off by BLAKE at the Lebanon post office, and one that was dropped off by BLAKE at the Sweet Home post office. On the same day, USPIS Grants Pass executed the search warrants and observed 70 gross grams of suspected diverted zolpidem, 160 gross grams of suspected MDMA, 520 gross grams of suspected counterfeit methamphetamine pills, and 160 gross grams of cocaine in the package seized from the Lebanon post office. USPIS Grants Pass observed 50 gross grams of suspected cocaine and 320 gross grams of suspected counterfeit methamphetamine pills in the package seized from the Sweet Home post office. The return address that was listed on the label affixed to both seized packages was "THE CAT'S MEOW 12000 SE 82nd Avenue, Happy Valley, OR." Although the (fake) business name is different, that return address is the exact same address that was listed as the return address on the label affixed to the package that was sent to the undercover agent in June of 2025 that contained 420.35 grams of methamphetamine as a result of CNJTF's third undercover purchase of drugs from ROCKY MOUNTAIN CONNECTIONS.

41. As a result of this specific information, along with USPS business records that appear to show a large volume of suspicious packages bearing third-party postage labels, it appears that BLAKE and HEFFELFINGER handle a majority of the drug order processing from their residence of 24 Grove Street, while the SUBJECT and Shea WASSON handle other functions regarding ROCKY MOUNTAIN CONNECTIONS, such as customer service, money laundering, and general oversight, along with shipping "pints" (promethazine and codeine) and "breakdown

weed" (ounce quantities of cannabis) from their residence of 5846 Flintwood Road, Unit B, Parker, CO.

42.     Upon observing the SUBJECT's Kraken account, it's clear that the SUBJECT is not engaging in cryptocurrency investing. This is because the SUBJECT does not hold onto cryptocurrency that she obtains for long, almost immediately cashes out (trades) the value of the cryptocurrency for U.S. currency before wiring it to bank accounts, and doesn't often purchase the cryptocurrency on Kraken.

43.     Upon observing the recovery seed phrases associated with the SUBJECT ASSETS in the SUBJECT's iCloud, investigators observed that most of the seed phrases appeared to be associated with software wallets. Unlike wallets associated with exchanges, software wallets are non-custodial, meaning that the app, domain, or service providing the seed phrases are not in control of the cryptocurrency in the wallet (unlike an exchange such as Kraken or Coinbase). Instead, the owner of the wallet (and the seed phrases associated with it) is the custodian of the wallet. As a result, possessing the seed phrase is akin to possessing and controlling the cryptocurrency (funds) found in the wallet associated with it. Many services that provide these seed phrases often warn users not to screenshot, take a picture of, or publicly disclose these seed phrases as doing so could result in theft and/or account takeover of the cryptocurrency in the wallet associated with the seed phrase. Despite this, nearly all the seed phrases associated with the SUBJECT ASSETS were pictures or screenshots taken by the SUBJECT. Regardless, the SUBJECT likely has not shared these seed phrases with anyone as a result of the danger associated with it and likely saved the pictures to her iCloud backup as a means of perceived safety/security.

44.     The investigation has shown that the SUBJECT is the suspected leader of the ROCKY MOUNTAIN CONNECTIONS DTO. In addition, the SUBJECT appears to control the

movement of drug proceeds in the form of cryptocurrency that are gained via drug orders made from the ROCKY MOUNTAIN CONNECTIONS domain. When combined with the facts above, the context of the circumstances at play, and the fact that Jesse WASSON has no other discernible job, the investigation indicates a likelihood that the SUBJECT ASSETS contain drug money.

45.     Using a law enforcement tool, investigators reconstituted all the SUBJECT ASSETS except for "sauce enter" (which was unable to be reconstituted). The wallets associated with "census weapon," "orphan sun," "few spread," "physical develop," "object gold," "cliff under," and "tip trend" were found to be wallets associated with software wallet service "Cake Wallet." "Swap unit" was found to be associated with software wallet "Electrum." "Sauce enter" was found to be associated with software wallet "Uphold Vault," which requires authentication to reconstitute and would have alerted the SUBJECT, so the wallet was not reconstituted. As a result, the transaction history and type of cryptocurrency is unknown. At the time the wallets were reconstituted, investigators observed a total of 1.00040224 Bitcoin ($117,866.50 at time of reconstitution), 0.00090497 Ethereum ($4.00 at time of reconstitution), 6.889741 Tether ($6.89 at time of reconstitution), and 26.27950338 Monero ($4,889.08 at time of reconstitution) among nine wallets (totaling $122,766.47 USD at time of reconstitution); the other nine wallets had a zero (or for "sauce enter," an unknown) balance.

46.     Investigators could also observe the transaction history among the reconstituted wallets. One such wallet, "subject west" contained approximately 4,893 Bitcoin addresses, which were associated with approximately 3,830 transactions (and their "hashes") from November 11, 2024 to date of reconstitution (August 15, 2025). Investigators know that the transaction "hash" (a sort of receipt for a transaction taking place on the blockchain) associated with the first undercover buy from ROCKY MOUNTAIN CONNECTIONS is

a892b57107948ace6869e2233c0e20479fc2e28c8755d6a5b87190ba3836cc6a (TRANSACTION HASH 1). This specific transaction took place on March 12, 2025, at 19:14:49 UTC where the undercover investigator sent 0.01088860 Bitcoin from a government-controlled address ending in "zgfn" to a Bitcoin address that the ROCKY MOUNTAIN CONNECTIONS domain via BTCPay directed the undercover agent to pay that ended in "vs38." TRANSACTION HASH 1 was found in the transaction history of "subject west," and the Bitcoin address ending in "vs38" was found in the list of Bitcoin addresses associated with the wallet. Additionally, the Bitcoin address ending in "ky3c" and transaction hash d3ca6936f509fe8103d8f5cfccb7bad6260a354cd5d53e47ddfd0935905c1828 (TRANSACTION HASH 2) were also located in the wallet. TRANSACTION HASH 2 combined the undercover funds associated with TRANSACTION HASH 1 with eight other Bitcoin addresses (likely other ROCKY MOUNTAIN CONNECTIONS drug orders since all eight of those Bitcoin addresses were also found in the wallet) and consolidated them into Bitcoin address "ky3c." "Ky3c" was empty prior to TRANSACTION HASH 2 but now contained 0.03764838 Bitcoin.

47. Investigators know that the transaction "hash" associated with the second undercover buy from ROCKY MOUNTAIN CONNECTIONS is 2051cdf0cdf7c06f3db07a1ac661866a90e78bacda6dc98ef9a6d689c09d0566 (TRANSACTION HASH 3). This specific transaction took place on April 22, 2025 at 16:54:58 UTC where the undercover investigator sent 0.01089551 Bitcoin from a government controlled address ending in "6yyh" to a Bitcoin address that the ROCKY MOUNTAIN CONNECTIONS domain via BTCPay directed the undercover agent to pay that ended in "6ey7." TRANSACTION HASH 3 was found in the transaction history of "subject west," and the Bitcoin address ending in "6ey7" was found in the list of Bitcoin addresses associated with the wallet. Additionally, the Bitcoin address ending

in "denw" and transaction hashes 7fb5aed903b6aa27e08625b0e877b85b4b47586c48a149d6de4ff833d170e684 (TRANSACTION HASH 4) and 6c1140da1bcd4fbedc7be5d42e28a111dd805a5dd81860c39200859cc78922d6 (TRANSACTION HASH 5) were also located in the wallet. TRANSACTION HASHES 4 and 5 combined the undercover funds associated with TRANSACTION HASH 3 with sixteen other Bitcoin addresses (likely other ROCKY MOUNTAIN CONNECTIONS drug orders since all eight of those Bitcoin addresses were also found in the wallet) and consolidated them into Bitcoin address "denw." "Denw" was empty prior to TRANSACTION HASHES 4 and 5, but now contained 0.09867421 Bitcoin. One such address that sent its total value to "denw" via TRANSACTION HASH 5 contained 0.00073773 Bitcoin, which at the time was worth about $67 USD. ROCKY MOUNTAIN CONNECTIONS' order minimum (at the time) was $150 USD. At approximately 2009 (EDT) on April 22, 2025, the official ROCKY MOUNTAIN CONNECTIONS Potato feed sent a message complaining that "Larry S" did not follow the rules and only spent $65 on a ROCKY MOUNTAIN CONNECTIONS order. The investigation has led investigators to believe that the SUBJECT is in control of the ROCKY MOUNTAIN CONNECTIONS Potato feed. So as a result, if the SUBJECT knows details about customers making orders on the ROCKY MOUNTAIN CONNECTIONS domain on the same day they happen, the SUBJECT is essentially in control of all cryptocurrency revenue made on the ROCKY MOUNTAIN CONNECTIONS domain.

48.     The total amount of Bitcoin that has transited through "subject west" from November 11, 2024 to date of reconstitution (August 15, 2025) is 14.29144108 (worth approximately $1,665,427 USD at time of writing).

49.     As referenced above, investigators know that the undercover funds used on the third

undercover purchase of drugs from ROCKY MOUNTAIN CONNECTIONS were swapped to Monero, and that an IP address assigned to the Starlink account with service at Shea WASSON and the SUBJECT's residence of 5846 Flintwood Road, Unit B was used to make that swap. Per an administrative subpoena, ChangeNow swapped 0.06500000 Bitcoin for 20.58175793 Monero, with payout hash 9e1a6c4cacc2c0dc31c5f969dc69419501802b5380ce7e1f7d40c6be7b45588d occurring at 1459 (EDT) on June 17, 2025 (TRANSACTION HASH 7). TRANSACTION HASH 7 was found in the Monero wallet associated with "physical develop," showing a deposit of 20.58175793 Monero on June 17, 2025 at 1459 (EDT). As a result, the SUBJECT and/or Shea WASSON indicated that a Monero address associated with "physical develop" would be the ChangeNow "output" or deposit address for the swapped Bitcoin, further proving that the SUBJECT is in control of ROCKY MOUNTAIN CONNECTIONS' drug proceeds and laundering them by swapping Bitcoin for Monero and moving it to different wallets.

50.     Investigators found transaction hash overlap between several of the SUBJECT ASSETS, the SUBJECT's Kraken wallet, and Shea WASSON's Kraken wallet. Meaning, that investigators observed Monero being withdrawn from wallets associated with the SUBJECT ASSETS and being deposited into the SUBJECT's and Shea WASSON's Kraken accounts. Meaning that the SUBJECT was moving Monero from the SUBJECT ASSETS to her and her wife's Kraken accounts, which were then soon cashed out for USD and wired to traditional bank accounts. Specifically, investigators observed eight transactions involving "census weapon" (seven transactions were directed to Shea WASSON's Kraken account, and one transaction was directed to the SUBJECT's Kraken account), eleven transactions involving "orphan sun" (three transactions were directed to Shea WASSON's Kraken account, and eight transactions were directed to the SUBJECT's Kraken account), nine transactions involving "few spread" (one

transaction was directed to Shea WASSON's Kraken account, and eight transactions were directed to the SUBJECT's Kraken account), one transaction involving "physical develop" (mentioned above) was directed to the SUBJECT's Kraken account, and one transaction involving "cliff under" was directed to the SUBJECT's Kraken account. The oldest transaction involved took place on June 6, 2024, and the most recent took place on June 17, 2025.

51.     In short, the investigation has indicated the following:

a.  ROCKY MOUNTAIN CONNECTIONS sells illegal drugs (controlled substances) online.

b.  ROCKY MOUNTAIN CONNECTIONS used to go by the name ROCKY MOUNTAIN PSCYHEDELICS.

c.  The SUBJECT, Shea WASSON, HEFFELFINGER, and BLAKE are all members of the ROCKY MOUNTAIN CONNECTIONS DTO.

d.  The SUBJECT is the suspected ROCKY MOUNTAIN CONNECTIONS DTO leader, in-charge of ordering bulk amounts of drugs for re-sale, operating the ROCKY MOUNTAIN CONNECTIONS social media and encrypted messenger apps, and handling oversight of the day-to-day operations.

1)  Shea WASSON assists the SUBJECT in all of her capacities mentioned above.

2)  HEFFELFINGER and BLAKE are suspected of shipping drugs on behalf of ROCKY MOUNTAIN PSCYHEDELICS/ CONNECTIONS out of their home in Lebanon, Oregon.

3)  HEFFELFINGER and BLAKE frequently use their phones to communicate during time periods relevant to the drug trafficking

investigation. The SUBJECT and Shea WASSON frequently use their phones to communicate during time periods relevant to the drug trafficking investigation.

e. BLAKE and the SUBJECT have used their phones to communicate during time periods relevant to the drug trafficking investigation.

f. HEFFELFINGER, BLAKE, and the SUBJECT have all traveled together recently, and have been in the same location twice within the past three months. Shea WASSON was also supposed to be present at a trip to Las Vegas, Nevada, that HEFFELFINGER, BLAKE, and the SUBJECT all were known to be present for.

52. As a result, the investigation has indicated that HEFFELFINGER, BLAKE, Shea WASSON, and the SUBJECT are involved in the ROCKY MOUNTAIN CONNECTIONS DTO and conspire together to distribute drug orders made on the ROCKY MOUNTAIN CONNECTIONS domain. Furthermore, the SUBJECT is in control of drug proceeds in the form of cryptocurrency that are from drug orders made on ROCKY MOUNTAIN CONNECTIONS.

## SEIZURE METHOD

53. Based on information obtained from SUBJECT's iCloud, investigators believe that the SUBJECT is the owner/ possessor, of the SUBJECT ASSETS. This is because private keys for cryptocurrency wallets are often represented by "seed words" (which make a "seed phrase"). The private key for a cryptocurrency wallet is essential to sending and receiving cryptocurrency; thus, the owner of the cryptocurrency wallet's private key is the owner of the wallet.

54. The government requests that it is authorized to seize any and all cryptocurrency by transferring the full account balance in each wallet to a public cryptocurrency address controlled by the government. This is to include any and all cryptocurrency from all derivation paths

associated with each wallet.

55.     The government further requests it is authorized to copy any wallet files and reconstitute them onto computers controlled by the government. By reconstituting the wallets on its own computers, the government will continue to collect cryptocurrency transferred into the SUBJECT's wallets as a result of transactions that were not yet completed at the time that the SUBJECT's devices were seized.

56.     The seizure warrant does not require the entry into/onto physical private property.

57.     Based on the foregoing, I assert there is probable cause to seize the SUBJECT ASSETS because such property is subject to forfeiture to the United States under 21 U.S.C. § 881(a)(6) (civil) as property furnished or intended to be furnished in exchange for a controlled substance, proceeds traceable to such an exchange, and property used or intended to be used to facilitate one or more violations of 21 U.S.C. §§ 841 and 846; under 21 U.S.C. § 853(a)(1) (criminal) as property constituting, or derived from, proceeds obtained, directly or indirectly, as the result of one or more violations of 21 U.S.C. §§ 841 and 846; under 18 U.S.C. § 981(a)(1)(A) (civil) as property involved in a transaction or attempted transaction in violation of 18 U.S.C. § 1956, or property traceable to such property; and under 18 U.S.C. § 982(a)(1) (criminal) as property involved in one or more violations of 18 U.S.C. § 1956, or property traceable to such property.

## SEALING REQUEST

58.     It is respectfully requested that the Court issue an order sealing, until further order of the Court, all papers submitted in support of the requested seizure warrant, including the application, this affidavit, and the requested seizure warrant. I believe that sealing these documents is necessary because the information to be seized is relevant to an ongoing investigation, as the

SUBJECT has not yet been arrested, and includes references to the active investigation. Premature disclosure of the contents of the application, this affidavit, and the requested seizure warrant may adversely affect the integrity of the investigation, including giving the SUBJECT a chance to destroy evidence or take other steps to hinder the investigation. Furthermore, because of the confidential nature of law enforcement analysis techniques disclosed herein, sealing is critical. Online drug vendors and other criminals in the online space frequently search the internet for legal process that describes current law enforcement techniques for tracing cryptocurrency and identifying online drug vendors. As a result, sealing this request is critical for countless ongoing investigations around the country.



Special Agent William Jake VonEssen
Drug Enforcement Administration

Subscribed and sworn to before me on this __3rd__ day of October 2025, via electronic means, specifically Facetime video.

Elizabeth A. Preston Deavers
United States Magistrate Judge